# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE:<br><br>HFV LIQUIDATING TRUST,<br><br>       Debtor. | Case No. 20-51066-mar<br><br>Chapter 11<br><br>Honorable Mark A. Randon |
| SHELDON STONE, as trustee for the HFV Liquidating Trust,<br><br>       Plaintiff,<br><br>v.<br><br>LIFE CARE SERVICES, LLC, and BRUCE BLALOCK,<br><br>       Defendants. | Adv. No. [XX-XXXX]<br><br><br>**JURY TRIAL DEMANDED** |

## ADVERSARY COMPLAINT

Plaintiff, Sheldon Stone (the "<u>Plaintiff</u>"), not individually but solely in his capacity as the Liquidating Trustee of the HFV Liquidating Trust (the "<u>Trust</u>"), files this adversary complaint (the "<u>Complaint</u>") against Life Care Services, LLC, an Iowa limited liability company ("<u>LCS</u>"), and Bruce Blalock, an individual ("<u>Blalock</u>" and together with LCS, "<u>Defendants</u>"), and alleges as follows:

## Nature of the Action

1.     Henry Ford Village, Inc. ("HFV" or "Debtor") was a nonprofit corporation that owned and operated a continuing care retirement community ("CCRC") located in Dearborn, Michigan (the "Community"). Beginning in 2010, HFV entered into a management agreement for LCS to become its agent and manager of the Community, responsible for developing and implementing the policies of HFV and managing the day-to-day financial affairs and operations of the Community. LCS installed one of its employees, Blalock, as the full-time Executive Director of the Community reporting to the HFV's board of directors.

2.     HFV placed its trust in LCS and Blalock to fulfill their obligations under the management agreement and faithfully discharge their fiduciary duties to HFV. Defendants betrayed that trust by failing to implement operational and financial controls necessary to serve HFV's residents and protect the financial stability of the Community. Under Defendants' management, HFV's financial performance rapidly deteriorated and HFV fell into severe financial distress.

3.     Instead of disclosing these growing problems to HFV's board of directors and implementing appropriate corrective action, including a timely chapter 11 bankruptcy filing, Defendants instead took actions to protect the interests of LCS at the expense of HFV in breach of Defendants' fiduciary duties. Beginning in June 2019, while HFV was in severe financial distress and unable to pay many of its

2

creditors, Defendants directed HFV to begin transferring over $1.3 million to LCS, purportedly on account of invoices that were several years old. Defendants' mismanagement and unlawful transfers dissipated HFV's remaining assets, accelerated HFV's financial distress and caused a substantial increase in restructuring costs for HFV due to its delayed chapter 11 bankruptcy filing.

4.     Defendants' actions caused catastrophic damage to HFV and its bankruptcy estate, with creditors asserting over $50 million of claims that have not been paid, including entrance fee refunds promised to HFV's former residents. Plaintiff, as the successor to HFV in this bankruptcy case, now brings this action for damages and other relief against Defendants for their conduct.

## **Jurisdiction and Venue**

5.     The United States Bankruptcy Court for the Eastern District of Michigan (the "Court") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. The adversary proceeding arises in the above-captioned chapter 11 case proceeding under title 11 of the United States Code, 11 U.S.C. §101–1532 (the "Bankruptcy Code"). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). This adversary proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 9014-1 and 9015-1 of the Local Rules for the United States Bankruptcy Court

for the Eastern District of Michigan (the "Local Rules").  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Jury Trial Demanded

6.      Pursuant to Federal Rule of Civil Procedure 38(b), made applicable to this proceeding by Bankruptcy Rule 9015(a), Plaintiff demands a jury trial on all issues triable by jury.

7.      Pursuant to 28 U.S.C. § 157(e), Bankruptcy Rule 9015, and Local Rule 9015, Plaintiff does not consent to have a jury trial conducted by a bankruptcy judge.

## Parties

8.      Plaintiff Sheldon Stone is the Trustee of the HFV Liquidating Trust formed pursuant to the *Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming Chapter 11 Plan of Henry Ford Village, Inc.* entered by the Court on December 6, 2021 [Docket No. 663] (the "Confirmation Order") and the chapter 11 plan annexed thereto (the "Plan").

9.      Defendant Life Care Services, LLC is an Iowa limited liability company with its principal place of business at 400 Locust St., Suite 820, Des Moines, IA 50309.  LCS is the former manager of Henry Ford Village, Inc. pursuant to that certain management agreement dated November 1, 2016 (the "Management Agreement").  As the manager and agent of HFV, LCS owed HFV fiduciary duties of care and loyalty, which it breached as set forth herein.

4

10.     Defendant Bruce Blalock is an individual who was an employee of LCS and served as an officer and Executive Director of Henry Ford Village, Inc.  Upon information and belief, Blalock is a citizen and resident of the State of Michigan.  As the Executive Director of HFV, Blalock owed fiduciary duties of care and loyalty, which he breached as set forth herein.

## Statement of Facts

## I.     HFV's Operations and the Entrance Fee Refund Model.

11.     Henry Ford Village, Inc. was a Michigan nonprofit corporation established to own and operate a continuing care retirement community (commonly referred to as a CCRC) located at 15101 Ford Road, Dearborn, Michigan 48126. HFV provided its residents with a senior living community comprised of independent living units, assisted living units and skilled nursing beds located on one campus that allowed residents to have their living and healthcare needs met as they moved through different phases of life.

12.     HFV operated the Community as an entrance fee model CCRC, which meant that new residents moving into an independent living unit were required to pay a substantial entrance fee (an "Entrance Fee") upon signing a residency agreement (each, a "Residency Agreement") and entering the Community.  Some or all of the entrance fee was refundable back to the resident or their estate upon the resident's departure from the Community (an "Entrance Fee Refund").  As of

5

January 1, 2020, entrance fees at HFV ranged from $27,500 to $356,000 and often comprised a substantial portion of the resident's life savings.

13.     HFV was regulated by the Michigan Continuing Care Community Disclosure Act (the "MCCCDA"), which required, among other things, HFV to provide a disclosure statement (the "Disclosure Statement") to prospective residents interested in signing a Residency Agreement and entering the Community. The purpose of the Disclosure Statement was to provide the prospective resident with all material facts about HFV and their potential residency, including the financial stability of the Community.

14.     HFV offered prospective residents a variety of residency plans that evolved over time. The residency plans differed in the amount of the required Entrance Fee, the amount of certain additional monthly service fees, and the percent of the Entrance Fee to be refunded back to the resident upon their departure from the Community.[1] After payment of the Entrance Fee and execution of the Residency Agreement, the new resident moved into their unit and was entitled to receive continuing care services from HFV. When their residency terminated, the former resident or their designee was entitled to their Entrance Fee Refund within 30 days

---

[1]     In addition to the Entrance Fee residency plans, residents also had the option to enter into rental residency plans, which did not require payment of an Entrance Fee.

6

following the re-occupancy of their independent living unit and payment of a new Entrance Fee by a new resident.

15. HFV pitched Entrance Fee residency plans as safe investments that simultaneously provided for a resident's long-term care while guaranteeing the repayment of substantial Entrance Fee Refunds to their heirs. HFV residents relied upon these Entrance Fee Refunds as investments they could pass on as a legacy to their children and grandchildren. Under Defendants' management, HFV never adequately informed prospective residents of the risk that an Entrance Fee Refund might not be repaid. Instead, HFV aggressively marketed Entrance Fee residency plans to unsuspecting future residents even as the financial stability of the Community deteriorated.

16. Revenue generated from Entrance Fees paid by new residents was required not only to fund the day-to-day operations and debt obligations of HFV, but also to pay Entrance Fee Refunds owed to former residents of HFV. That is, HFV's ability to timely satisfy its Entrance Fee Refund obligations to its former residents depended on its ability to convince new residents to sign Residency Agreements, pay new Entrance Fees and move into the Community.

17. Under Defendants' management, HFV failed to attract enough new residents to generate the revenue necessary to timely repay Entrance Fee Refunds to its former residents, resulting in the accrual of substantial unpaid Entrance Fee

7

Refunds and broken promises to HFV's former residents who had trusted HFV with their life savings. Even after Defendants knew, or should have known, that HFV could not meet its obligations to pay Entrance Fee Refunds, Defendants allowed HFV to continue to aggressively recruit new residents to pay new Entrance Fees and move into the Community without adequately disclosing the increasing risk that HFV could not honor its obligation to pay the corresponding Entrance Fee Refund when due. This mismanagement resulted in the accrual of millions of additional Entrance Fee Refund liabilities for HFV that Defendants knew, or should have known, HFV would be unable to pay. Making matters worse, as the financial condition of HFV continued to deteriorate, Defendants unreasonably and improperly delayed corrective action, including promptly seeking bankruptcy protection, and instead directed HFV to make over $1.3 million in transfers to LCS, which dissipated critical liquidity for HFV and drastically increased HFV's liabilities, including significant restructuring costs required for HFV's delayed bankruptcy filing on October 28, 2020 (the "Petition Date").

18. At the time HFV filed for bankruptcy, it had accrued well over $110 million of Entrance Fee Refund liabilities, including over $7 million of past-due Entrance Fee Refunds promised but not paid to HFV's former residents and their families.

156843910.4

## II.	Corporate Governance and Management of Henry Ford Village, Inc.

### A.	The HFV Board of Directors

19.	HFV was governed by a board of directors (the "Board").  The Board relied on the advice of LCS, as its third-party manager, and Blalock, as its Executive Director, in setting corporate policies for HFV and monitoring HFV's operations and financial performance.

### B.	LCS's Management Agreement and Responsibilities

20.	On December 1, 2010, HFV first engaged LCS to manage the operations and finances of the Community pursuant to a Management Agreement (the "Initial Management Agreement").  On November 1, 2016, HFV and LCS entered into a new Management Agreement.  A copy of the Management Agreement is attached hereto as **Exhibit A**.  Pursuant to the Management Agreement, LCS assumed responsibility as the agent of HFV and undertook the accompanying fiduciary duties of care and loyalty owed by an agent to its principal.

21.	The Management Agreement required LCS, as agent and fiduciary of HFV, to, among other things, implement the policies, budgets, directives and goals of HFV and manage the day-to-day operations of the Community.  *See* Management Agreement § 1.1.[2]  The Management Agreement also required LCS to recommend,

---

[2]	Section 1.1 of the Management Agreement states:

9

develop, install and maintain appropriate operating procedures, systems and controls

for the Community. *See id.* § 2.1. Additional obligations of LCS included:

- Establish and maintain a system of financial controls for HFV (*see id.* § 2.3);

- Provide an Executive Director and other Directors (i.e., Director of Healthcare) for the Facility (*see id.* § 2.5);

- Maintain insurance for its employees for, among other things, management errors and omissions liability (*see id.* § 2.7); and

- Maintain the "highest ethical standards" and comply with "all laws, regulations, policies and procedures, which apply to their workplace." (*see id.*, <u>Attachment 1</u>, the "Life Care Services Code of Conduct").

22.     In short, LCS, as manager, agent and fiduciary of HFV, was required

to provide services essential to the successful day-to-day operation and financial

management of HFV.

23.     In conjunction with entering the Management Agreement, LCS and

HFV also executed a Memorandum of Understanding (the "<u>MOU</u>," attached hereto

---

**Section 1.1.  General Responsibility of LCS.**  LCS assumes responsibility, ***as agent of the Owner,*** to serve as the real estate manager of the Community, and in connection therewith, to recommend and regularly evaluate policies and goals of the Owner, implement the policies, budgets, directives, and goals for the Community established by the Owner, manage the day-to-day operations of the Community in accordance with the Owner's policies, directives and goals, provide the Owner with relevant information (as hereinafter provided) as to past operations, and make recommendations as to the future of the Community.  LCS is an independent contractor, and not a partner or joint venturer with the Owner. The services of LCS are more particularly described in Article II.

(emphasis added).

as **Exhibit B**).  In the MOU, HFV acknowledged that, as of October 24, 2016, there was $2,089,941.82 in outstanding invoices owed to LCS under the Initial Management Agreement (the "<u>Aged Invoices</u>").  Pursuant to the MOU, LCS was required HFV to pay all new LCS invoices in full each month as "a priority payment" and to repay the Aged Invoices as part of a "five year financial plan."

24.     Consistent with its obligations under the Management Agreement, LCS provided HFV with two of its employees: Defendant Bruce Blalock, who served as the Executive Director of HFV, and Heather Scott, who served as the Administrator of Health Services of HFV.  As Executive Director, Blalock owed fiduciary duties of care and loyalty to HFV.  Blalock reported directly to the Board, developed strategic objectives for HFV, and served as the chief administrative officer for HFV.  As the highest-ranking officer of HFV, Blalock was responsible for developing and implementing all aspects of the Community's operations and finances.

25.     The following is the corporate organizational chart for HFV:



11

**III. Defendants' Mismanagement Deepens the Financial Distress at HFV.**

26.    Under Defendants' management, HFV began to experience significant financial distress, including decreasing occupancy, increasing Entrance Fee Refund obligations, and decreasing cash available to pay its operating costs and long-term bond debt.

27.    From 2010, when LCS was first hired to manage HFV, through 2020, when HFV ultimately filed for bankruptcy, HFV's occupancy for independent living units steadily declined from 81% down to 68.8%, as reflected in the following chart:

| Henry Ford Village, Inc. — Year End Independent Living Census 2010 - 2020 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Capacity | 856 | 856 | 856 | 856 | 855 | 854 | 854 | 853 | 853 | 853 | 841 |
| Census | 696 | 675 | 668 | 642 | 633 | 644 | 647 | 633 | 620 | 629 | 587 |
| Percent Occupied | 81% | 79% | 78% | 75% | 74% | 75% | 76% | 74% | 73% | 74% | 69% |

28.    This decline in occupancy for independent living units resulted in a corresponding decline in Entrance Fees paid into HFV.  The decrease in revenue from new Entrance Fees put pressure on HFV's ability to pay Entrance Fee Refunds as they came due.  As a result, HFV began defaulting on its obligations under the Residency Agreements—and breaking the promises made to HFV residents and their families—to timely pay Entrance Fee Refunds when due, as reflected by the explosive growth of accrued Entrance Fee Refund liabilities from approximately

$600,000 when Defendants began managing HFV in 2010 to $7 million when HFV ultimately filed for bankruptcy in 2020, as reflected in the following chart:

| Year | Resident Refunds Payable |
|------|--------------------------|
| 2010 | $ 621,231.00 |
| 2011 | $ 974,033.00 |
| 2012 | $ 1,692,343.00 |
| 2013 | $ 938,501.00 |
| 2014 | $ 1,171,184.00 |
| 2015 | $ 3,452,076.00 |
| 2016 | $ 2,969,661.00 |
| 2017 | $ 3,739,556.00 |
| 2018 | $ 6,187,965.00 |
| 2019 | $ 5,752,759.00 |
| 2020 | $ 7,000,000.00 |

29.    Instead of disclosing these issues to the Board and recommending a corrective plan, such as seeking immediate relief under the Bankruptcy Code, Defendants instead painted an unrealistic rosy picture that ignored the growing financial distress at HFV.  As a result, unsuspecting vendors continued to extend credit to HFV that was never repaid.

30.    Even worse, despite HFV's deteriorating financial performance, Defendants allowed HFV to continue to aggressively market and sell Entrance Fee residency agreements to new, unsuspecting residents and their families without adequately disclosing the growing financial distress at HFV.  At the same time, Defendants instructed and/or allowed HFV to delay and withhold Entrance Fee Refunds and improperly pressure former residents and their families to agree to

13

accept a lower Entrance Fee Refund than required under the Residency Agreement in breach of their fiduciary duties, which caused additional damage to HFV.

**A.**   **As HFV's Financial Condition Worsens, Defendants Delay Corrective Action and Direct HFV to Transfer Millions to LCS.**

31.   By June 2019, HFV's occupancy for independent living units had dropped to 72%, and its unpaid Entrance Fee Refund liabilities had ballooned to over $5.7 million.  At this time, Defendants should have advised HFV to seek bankruptcy protection to preserve liquidity, prevent the accrual of further liabilities and maximize the value of its assets for creditors.  Instead, Defendants directed HFV to begin making over $1.3 million in transfers to LCS over several months on account of the Aged Invoices that were several years old.  Upon information and belief, this decision was never authorized by—or even disclosed to—the HFV Board.  Rather, LCS, as the agent and manager of HFV, and Blalock, as the Executive Director of HFV with control over its operations, finances and accounting, directed the transfer of over $1.3 million to LCS at a time when HFV was in severe financial distress and not paying Entrance Fee Refunds to former residents and other unsecured obligations.  These actions dissipated assets and critical liquidity at a time when HFV was most vulnerable, instead of preserving that liquidity and seeking immediate protection in bankruptcy.

32.   Starting on June 14, 2019, and continuing through the Petition Date, Defendants caused HFV to transfer a total of at least $1,360,702.52 to LCS on

14

account of the Aged Invoices that were several years old.  In total, HFV transferred over $6.2 million to LCS prior to the Petition Date.

33.     Upon information and belief, Defendants delayed a timely bankruptcy filing for HFV and instead directed HFV to transfer its limited cash to pay LCS's Aged Invoices—which had otherwise remained unpaid for years—because it knew that these Aged Invoices might otherwise only receive a small distribution in bankruptcy.

34.     These improper payments to LCS dissipated the assets and critical liquidity of HFV when it should have been used to prepare a bankruptcy filing to preserve and maximize the value of HFV's assets for all creditors.

35.     As a result of Defendants' actions, hundreds of former residents and their families lost tens of millions in Entrance Fee Refunds that, in many instances, constituted their life savings entrusted to HFV.

## IV.     Chapter 11 Bankruptcy Filing

36.     More than 16 months after Defendants directed HFV to transfer millions to LCS on account of the Aged Invoices, HFV eventually filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on the Petition Date.  At the time of filing, the Debtor disclosed a whopping $112.3 million of Entrance Fee Refund liabilities, including $7.0 million of past due Entrance Fee Refunds owed to former residents and their families.

15

37.     The Debtor was forced to incur substantial professional fees and obtain expensive debtor-in-possession financing of over $3.2 million as a result of HFV's unreasonable delay in seeking bankruptcy protection.

38.     In bankruptcy, the Debtor commenced a marketing and sales process to sell the Community subject to bid procedures approved by the Bankruptcy Court. Despite its best efforts, the Debtor was unable to find a buyer willing to maintain the entrance fee model and honor existing Entrance Fee Refund liabilities—as is typical in the sale of an entrance fee CCRC—because of the massive amount of unpaid Entrance Fee Refund liabilities that Defendants permitted to accrue without any corrective action or earlier bankruptcy filing in the months and years leading up to the Petition Date.  Instead, the Debtor sold the Community to a new third-party owner and operator that converted the Community into a for profit rental model senior living facility.

39.     The sale of the Community closed on September 30, 2021.  Pursuant to the Sale Order, proceeds from the sale were first used to pay off the Debtor's secured bond debt with the remaining proceeds used to fund a chapter 11 plan of liquidation for the benefit of the Debtor's remaining creditors.

40.     On December 6, 2021, the Bankruptcy Court entered the Confirmation Order approving the Plan.

41. The main purpose of the Plan was to establish the HFV Liquidating Trust as the successor to the Debtor to take title to all remaining assets of the estate, including net cash proceeds from the sale of the Community and all estate causes of action. *See generally* Plan, Art. IV.

42. Specifically, Section 4.6 of the Plan provides that on the Effective Date, the Debtor and its estate shall be deemed to have transferred and/or assigned to the Trust any and all assets of the Debtor and its estate, including all causes of action of the Debtor and its estate. *See* Plan § 4.6.

43. The Plan became effective on January 19, 2022 (the "Effective Date").

44. As of the Effective Date, the Trust was formed and the Debtor transferred all its remaining assets, including estate causes of action, to the Trust. Sheldon Stone of Capstone Partners was appointed the Trustee pursuant to the Confirmation Order and Plan. The Trustee is responsible for administering all Trust assets, including the investigation and pursuit of estate causes of action, including estate claims against Defendants.

## CAUSES OF ACTION

### COUNT ONE

**Breach of Fiduciary Duty of Care**
**(Defendants LCS and Blalock)**

45. Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

17

46.     As the manager and agent of HFV, LCS owed fiduciary duties to HFV, including the duty of care.

47.     As the Executive Director of HFV, Defendant Blalock also owed fiduciary duties to HFV, including the duty of care.

48.     Defendants breached their fiduciary duties of care through the conduct described above, including but not limited to:

(a)     failing to recommend, develop, install and maintain effective operating procedures, systems and controls for HFV;

(b)     failing to establish and maintain a system of effective financial controls for HFV;

(c)     directing HFV to delay or withhold payment of Entrance Fee Refunds owed to former Residents and their families in violation of the Residency Agreements;

(d)     allowing millions of Entrance Fee Refund liabilities to accrue and push HFV deeper into financial distress;

(e)     failing to appropriately disclose to the HFV Board the severe and growing financial distress of HFV and recommend corrective action, including a timely bankruptcy filing to preserve and maximize value for creditors;

(f)     failing to appropriately disclose to prospective residents and other unsecured creditors the severe and growing financial distress of HFV and resulting risk of default; and

(g)     directing HFV to transfer to LCS millions in the months and years leading up to the Petition Date when Defendants knew, or should have known, that HFV was in severe financial distress, unable to pay Entrance Fee Refunds promised to former residents and their families, and on the verge of bankruptcy.

49.     Defendants' breaches of their fiduciary duties of care resulted in HFV incurring additional and unnecessary indebtedness well beyond its ability to pay, breaching commitments to its residents and incurring millions of additional expenses due to HFV's unreasonably delayed bankruptcy filing.  As a result, the Debtor's creditors have been harmed and will not receive the full amount that they were owed by HFV.

50.     Defendants' breaches of their fiduciary duties of care damaged HFV and its bankruptcy estate in an amount to be proven at trial.

## COUNT TWO

### Breach of Fiduciary Duty of Loyalty
### (Defendants LCS and Blalock)

51.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

19

52.     As the manager and agent of HFV, LCS owed fiduciary duties to HFV, including the duty of loyalty.

53.     As the Executive Director of HFV, Defendant Blalock also owed fiduciary duties to HFV, including the duty of loyalty.

54.     Defendants breached their fiduciary duties of loyalty to HFV through the conduct described above, including but not limited to (a) directing HFV to transfer to LCS over $1.3 million in the months and years leading up to the Petition Date when Defendants knew that HFV was in severe financial distress, unable to pay Entrance Fee Refunds promised to former residents and their families, and on the verge of bankruptcy, and (b) failing to disclose to or seek approval from the HFV Board for these payments.

55.     Defendants' breaches of their fiduciary duties of loyalty resulted in the depletion of critical liquidity and substantial increase in liabilities and expenses due to HFV's unreasonably delayed bankruptcy filing.  As a result, the Debtor's creditors have been harmed and will not receive the full amount that they were owed by HFV.

56.     Defendants' breaches of their fiduciary duties of loyalty damaged HFV and its bankruptcy estate in an amount to be proven at trial.

## COUNT THREE

**Avoidance of Preferential Transfers Pursuant to
11 U.S.C. § 547
(Defendant LCS)**

20

57. Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

58. As the managing agent of HFV, Defendant LCS was an insider of Debtor pursuant to 11 U.S.C. § 101(31)(F).

59. During the one year prior the Petition Date (the "Preference Period"), HFV made transfers to or for the benefit of Defendant LCS in an aggregate amount not less than $1,008,643.77 (the "Preferential Transfers").

60. Each of the Preferential Transfers was made by HFV and constituted transfers of an interest in HFV's property.

61. Defendant LCS was a creditor of HFV at the time of each of the Preferential Transfers.

62. Each of the Preferential Transfers was to or for the benefit of LCS as a creditor within the meaning of 11 U.S.C. § 547(b)(1) because each transfer either reduced or fully satisfied a debt or debts then owed by HFV to LCS.

63. Each of the Preferential Transfers was made for, or on account of, an antecedent debt or debts owed by HFV to LCS before such Preferential Transfers were made, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of LCS prior to being paid by HFV.

64. Each of the Preferential Transfers was made while HFV was insolvent.

156843910.4

65. Each of the Preferential Transfers was made during the Preference Period.

66. As a result of the Preferential Transfers, LCS received more than it would have received if (i) HFV's bankruptcy case was a case under chapter 7 of the Bankruptcy Code; (ii) the Preferential Transfers had not been made; and (iii) LCS received payments of its debts under the provisions of the Bankruptcy Code.

67. Each of the Preferential Transfers is avoidable pursuant to 11 U.S.C. § 547(b).

## COUNT FOUR

### Avoidance of Fraudulent Transfers Pursuant to
### 11 U.S.C. § 548(a)(1)(A)
### (Defendant LCS)

68. Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

69. Pursuant to 11 U.S.C. § 548, a trustee or debtor may avoid any transfer of an interest of the debtor in property, or any obligation that was incurred by the debtor, that was made or incurred within two years before the Petition Date if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder or delay, any entity to which the debtor was or became on or after the date that such transfer was made or such obligation was incurred, indebted.

22

70.     HFV made transfers to LCS of at least $1,656,052.23 in the two years prior to the Petition Date (the "Bankruptcy Fraudulent Transfers").

71.     HFV made the Bankruptcy Fraudulent Transfers to LCS with the intent to delay and/or hinder payments owed to other creditors of HFV, including former residents and their families owed substantial Entrance Fee Refunds.

72.     LCS did not receive the Bankruptcy Fraudulent Transfers in good faith due to its knowledge of the impaired financial condition of HFV, its knowledge of and/or direction to HFV to make the Bankruptcy Fraudulent Transfers, and/or its knowledge of the voidability of the Bankruptcy Fraudulent Transfers.

73.     The Bankruptcy Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A).

## COUNT FIVE

**Avoidance of Fraudulent Transfers Pursuant to
11 U.S.C. § 544, MCL § 566.31, *et seq.*
(Defendant LCS)**

74.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

75.     Pursuant to 11 U.S.C. § 544 and MCL § 566.31 *et. seq.*, ("MUVTA") a trustee or debtor may avoid any transfer of an interest of the debtor in property, or any obligation that was incurred by the debtor, that was made or incurred within six years before the Petition Date if the debtor voluntarily or involuntarily made such

transfer or incurred such obligation with actual intent to hinder or delay, any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

76.     HFV made transfers to LCS of at least $4,137,350.02 in the six years prior to the Petition Date (the "<u>MUVTA Fraudulent Transfers</u>" and together with the Bankruptcy Fraudulent Transfers and Preferential Transfers, the "<u>Avoidable Transfers</u>").

77.     HFV made the MUVTA Fraudulent Transfers to LCS with the intent to delay and/or hinder payments owed to other creditors of HFV, including former residents and their families owed substantial Entrance Fee Refunds.

78.     LCS did not receive the MUVTA Fraudulent Transfers in good faith due to its knowledge of the impaired financial condition of HFV, its knowledge of and/or direction to HFV to make the Fraudulent Transfers, and/or its knowledge of the voidability of the MUVTA Fraudulent Transfers.

79.     The MUVTA Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 544 and MCL § 566.34.

## COUNT SIX

**Recovery of Avoidable Transfers Pursuant to
11 U.S.C. § 550
(Defendant LCS)**

24

80.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

81.     Plaintiff is entitled to avoid each of the Avoidable Transfers pursuant to 11 U.S.C. §§ 544, 547 and 548.

82.     Defendant LCS was the initial transferee of each of the Avoidable Transfers.

83.     Pursuant to 11 U.S.C.§ 550(a), Plaintiff is entitled to recover from Defendant LCS each of the Avoidable Transfers, plus interest thereon to the date of payment and the costs of this action.

**COUNT SEVEN**

**Disallowance of all Claims Pursuant to**
**11 U.S.C. § 502(d)**
**(Defendant LCS)**

84.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

85.     LCS is a transferee of transfers avoidable under 11 U.S.C. §§ 544, 547 and/or 548, which property is recoverable under 11 U.S.C. § 550.

86.     LCS has not paid the amount of the Avoidable Transfers, or turned over such property, for which LCS is liable under 11 U.S.C. § 550.

87.     Pursuant to 11 U.S.C. § 502(d), any and all claims of LCS, against the chapter 11 estate or Plaintiff must be disallowed until such time as LCS pays to

Plaintiff an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

## COUNT EIGHT

### Equitable Subordination of all Claims Pursuant to
### 11 U.S.C. § 510(c)
### (Defendant LCS)

88.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

89.     Defendant LCS's breach of fiduciary duties and fraudulent transfers constituted inequitable conduct that harmed the Debtor's bankruptcy estate and its creditors.  To remedy the harm caused by LCS's inequitable conduct, any and all claims LCS holds against the Debtor and its estate should be subordinated below the claims of general unsecured creditors pursuant to 11 U.S.C. § 510(c).

90.     Subordination of LCS's claims is consistent with the provisions of the Bankruptcy Code.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in favor of the Plaintiff as follows:

(i)     Entry of judgment against Defendants LCS and Blalock for breach of fiduciary duty of care under Count One in an amount to be determined at trial;

26

(ii)     Entry of judgment against Defendants LCS and Blalock for breach of fiduciary duty of loyalty under Count Two in an amount to be determined at trial;

(iii)    Entry of judgment against Defendant LCS avoiding all of the Avoidable Transfers under Counts Three, Four and Five and directing Defendant LCS to return to the Plaintiff the amount of the Avoidable Transfers pursuant to 11 U.S.C. §§ 544, 547, 548, 550 and MCL § 566.34 under Count Six plus pre-judgment interest and, to the fullest extent allowed by applicable law, the costs and expenses of this action, including without limitation, attorneys' fees;

(iv)    Entry of judgment against Defendant LCS disallowing any claim that LCS may have against the Debtor's bankruptcy estate under Count Seven until such time as LCS repays to the Plaintiff the value of all Avoidable Transfers pursuant to 11 U.S.C. § 502(d);

(v)     Entry of judgment against Defendant LCS subordinating any claim that LCS may have against the Debtor's bankruptcy estate to all other allowed claims under Count Eight; and

(vi)    awarding any other relief the Court deems appropriate.

Dated: June 3, 2022

Respectfully submitted,

By: */s/ Eric E. Walker*

Eric E. Walker, IL Bar No. 6290993
Kathleen M. Allare, IL Bar No. 6326536
PERKINS COIE LLP
110 North Wacker Drive, Suite 3400
Chicago, Illinois 60606
Phone:    (312) 324-8400
Fax:       (312) 324-9400
E-mail:   EWalker@perkinscoie.com
              KAllare@perkinscoie.com

James Morgan
Howard & Howard Attorneys, PLLC
200 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Phone:    (312) 456-3414
Fax:       (312) 939-5617
E-mail:   JEM@h2law.com

*Counsel to HFV Liquidating Trust*

156843910.4